UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| PETROBRAS AMERICA INC. AND | § | |
| CERTAIN UNDERWRITERS AT LLOYD'S, | § | |
| LONDON AND INSURANCE | § | |
| COMPANIES | § | |
| SUBSCRIBING TO POLICY | § | C.A. No. 4:12-CV-888 |
| NO. B0576 / JM 12318, | § | Jury |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| VICINAY CADENAS, S.A., | § | |
| | § | |
| Defendant | § | |
| | § | |

<u>THIRD AMENDED COMPLAINT</u>

Certain Underwriters at Lloyd's, London and Insurance Companies

subscribing to Policy No. B0576 / JM 12318 (collectively "Underwriters") file this

Third Amended Complaint against Vicinay Cadenas, S.A. ("Vicinay").

I.     <u>The Parties</u>

1.     Plaintiff Petrobras America Inc. ("Petrobras") is a Delaware

corporation with its principal place of business in Houston, Texas. At all relevant

times, Petrobras was, and still is, doing business in Texas within this District.



2.     Plaintiffs, Certain Underwriters at Lloyd's, London and Insurance Companies (collectively "Underwriters"), are underwriting syndicates at Lloyd's and/or London and Insurance Companies incorporated under the laws of the United Kingdom, the United States of America, and/or other foreign nations, and have subscribed to that certain Policy No. B0576 / JM 12318 (the "Policy"), a policy of marine insurance that they caused to be issued to Petrobras. The Policy provides insurance coverage to Petrobras for certain losses involving Petrobras' oil and gas production operations in the Cascade and Chinook oil fields located in the Walker Ridge Area, Block 249, on the Outer Continental Shelf in the Gulf of Mexico. The Underwriters, each for itself and no other, severally, not jointly, based only on its own respective percentage of interest, are contractually subrogated, in whole or in part, to those causes of action and/or claims for relief pleaded herein by and on behalf of Petrobras, their assured.

3.     Defendant Vicinay is a corporation organized and existing under the laws of the Kingdom of Spain, with its home office located at Particular de Sagardui, 5, Bilbao, Vizcaya, Spain, 48015. At all relevant times, Vicinay was, and still is, doing business in Texas within this District. Vicinay was served in accordance with the Hague Convention on October 16, 2012 and has made an appearance in this litigation.

2

329403

## II.   Jurisdiction

4.     The Court has federal question jurisdiction pursuant to 43 U.S.C. § 1349(b)(1) and 28 U.S.C. § 1331 because it arises out of and/or in connection with operations conducted on the Outer Continental Shelf of the United States, involving exploration, development, or production of the minerals, of the subsoil and seabed of the Outer Continental Shelf.

5.     In the alternative, the Court has admiralty or maritime jurisdiction in accordance with Article III, Section 2 of the United States Constitution, and pursuant to 28 U.S.C. § 1333.

## III.   Venue

6.     Venue is proper in this Court pursuant to 43 U.S.C. § 1349(b)(1) and 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue occurred in this District, and the Defendant resides in and/or may be found in this District and/or is subject to personal jurisdiction in this District.

7.     Alternatively, if maritime law applies, pursuant to Fed. R. Civ. P. 82, no allegation of venue is required.

3

329403

IV.    <u>Factual Background</u>

8.     This action arises from the failure of a defective tether chain manufactured by Vicinay and used by Petrobras as part of a floating production, storage and offloading ("FPSO") vessel system built to service Petrobras' oil and gas production operations in the Cascade and Chinook oil fields in the Walker Ridge Area, Block 249, on the Outer Continental Shelf in the Gulf of Mexico, approximately 180 miles off the coast of Louisiana.

**The Free Standing Hybrid Riser systems**

9.     The oil and gas wells in the Cascade and Chinook oil fields are connected to the FPSO by free standing hybrid riser systems ("FSHRs" or "riser systems"). The riser systems attach to a submerged turret production buoy ("STP") which is independently anchored with its own mooring system, and connected to the FPSO vessel. The FPSO vessel processes and stores oil and gas in preparation for offloading to other vessels which transport it to shore.

10.    The FSHRs include a lower riser stem that connects to the well production lines on the floor of the Gulf of Mexico and an upper riser assembly that is attached by a tether chain to a buoyancy can which keeps the entire riser system in place.

329403

11.     Petrobras contracted with Technip USA Inc. ("Technip") to engineer, procure, construct, and install the FSHRs, including the tether chains.

### The Tether Chains Manufactured by Vicinay

12.     Vicinay is in the business of designing, manufacturing, selling and/or marketing marine chains for use in offshore marine construction, vessel mooring, and oil and gas exploration and production activities.

13.     On October 6, 2008, Technip and Vicinay executed a purchase order for the manufacture and sale of five 171 mm, R5 tether chains to connect the upper riser assemblies to the buoyancy cans, shackles for the chains, one test sample chain, and two spare shackles (the "Technip-Vicinay Purchase Order"). Petrobras was not a party to the Technip-Vicinay Purchase Order, and it never negotiated, reviewed or signed the Technip-Vicinay Purchase Order. On October 8, 2008, representatives of Vicinay, Technip and Petrobras attended a meeting regarding the prospective manufacturing of the tether chains at Vicinay's offices in Bilbao, Spain. During the meeting, Javier Vicinay on behalf of Vicinay represented to Petrobras that (1) Vicinay would not weld-over any crack or other defect discovered in any link of the chains, and (2) if material defects were discovered or identified in any link of the tether chains, the entire chain would be scrapped and a new chain would be manufactured.

329403

14.     Vicinay was responsible for all engineering services associated with the chains.

15.     The chains were manufactured in Vicinay's plant in Bilbao, Spain.

16.     Vicinay placed the chains in the stream of commerce by designing, manufacturing, and selling them.

17.     The riser systems including chains were installed between November 2009 and August 2010.

**The Casualty**

18.     On March 23, 2011, an alarm sounded for the Chinook FSHR No. 1, and Petrobras sent a remotely operated vehicle ("ROV") to the location. The ROV operator discovered that the buoyancy can had broken free, the upper riser assembly was hanging from the jumper cable attached to the STP, and the tether chain, lower riser assembly, and riser stem had fallen to the sea floor. The buoyancy can was located the next day, floating approximately 36 miles northwest of the FPSO vessel. Petrobras recovered the buoyancy can, the broken tether chain, the failed link in the chain, and the other parts of the riser systems.

19.     Due to the chain failure, Petrobras was forced to suspend all operations to develop the Cascade and Chinook fields, and investigated the cause of the chain failure.

6

**The Defective Chain**

20.    The investigation revealed that a link in the tether chain manufactured by Vicinay had failed as a result of one or more cracks or other defects in the chain that were welded over by Vicinay when the link and the chain were being manufactured (in contravention of Vicinay's express representations to the contrary), and which Vicinay thereafter had willfully and recklessly concealed.

**Petrobras' and the Underwriters' Damages**

21.    As a result of the failure of the defective chain, Petrobras and Underwriters have collectively sustained over $400 million in damages for the recovery, removal and abandonment of the damaged portions of the FSHR, the loss of the FSHR, repair and replacement of the pipeline end terminal and other seafloor components, and further damages incidental to the loss of use of the FSPO vessel and deferred oil-and-gas production in the Chinook field.

22.    Underwriters reserve the right to supplement their damages claim to include all additional losses to which they are subrogated caused by Vicinay's defective chain, once such losses have been determined and quantified.

23.    Underwriters have indemnified Petrobras for a portion of its damages sustained as a result of the failure of Vicinay's defective tether chain,

and are contractually subrogated to Petrobras' rights to recover for those damages.

**The Law**

24.     Pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A) and 43 U.S.C. § 1349(b)(1), federal law applies to claims arising out of activity on the OCS and borrows adjacent state law as a gap-filler, which is the adjacent State of Louisiana, whose laws shall govern this action. However, if the Court determines maritime law shall apply to this dispute, Underwriters alternatively plead their causes of action under maritime law.

V.     Causes of Action

25.     Underwriters incorporate by reference paragraphs 1 through 24 for the causes of action that follow.

**First Cause of Action – Products Liability**

26.     Underwriters bring their products liability claim under the Louisiana Products Liability Act. However, to the extent or in the event that the Louisiana Products Liability Act does not apply, Underwriters bring this claim in the alternative under maritime law.

27.     The tether chain, manufactured by Vicinay and sold to Technip was a product within the meaning of the Louisiana Products Liability Act, LA. REV. STAT.

8

9:2800.53(3), and Vicinay was the manufacturer and/or seller within the definition of that statute.

28.    Vicinay agreed to manufacture the tether chain without welding over cracks or other defects and represented that if defects were discovered or identified in any link of the tether chains, Vicinay would not weld over any cracks or defects, but would instead scrap the defective chain and manufacture a new one.

29.    The tether chain was unreasonably dangerous within the meaning of LA. REV. STAT. 9:2800.54 *et. seq*., in construction and/or composition, because at the time the product left Vicinay's custody and control, the tether chain deviated in a material way from the manufacturing specifications and representations made by Vicinay to Petrobras in the October 8, 2008 meeting in such a way that rendered the chain defective and unsafe for its intended purpose.

30.    The tether chain was unreasonably dangerous in construction and/or composition due to, including but not limited to, defects in the steel and/or Vicinay's welding over of cracks or other defects in the chain during the manufacturing process.

31.    Further, prior to the manufacturing of the chain, Vicinay (the manufacturer of the tether chain) made express representations to Petrobras that

it would not weld over cracks or defects in the chain. However, during the manufacturing of the chain and in direct contravention of its representations to Petrobras, Vicinay sought to conceal cracks and/or other defects in the chain by welding over them. Furthermore, Vicinay's conduct was reckless and intentional.

32.    The chain was unreasonably dangerous because Vicinay failed to adequately warn Petrobras that the chain did not meet the agreed upon manufacturing standards and/or that the chain could not sustain the loads placed on it by the buoyancy cans and the attached riser. The tether chain failed to conform to Vicinay's express warranty. Vicinay's failure to give adequate warnings of the danger of the chain, which dangers were known and/or should have been known by Vicinay though the application of reasonably developed human skill and foresight, and/or Vicinay's failure to provide adequate warning to avoid such dangers, rendered the chain unreasonably dangerous.

33.    In addition and/or in the further alternative, by virtue of its undertakings and activities and the risks of injury involved and inherent therein, Vicinay had a legal duty to sue due care, competence, skill, and reasonable caution under the circumstances, equivalent to that employed by a reasonable and prudent person, in designing, manufacturing, and/or marketing the chain.

329403

34.   Vicinay is liable for all damages proximately caused by the unreasonably dangerous conditions created by the manufacture of the tether chain, the failure of the tether chain to conform to warranties and Vicinay's failure to warn about the tether chain.

35.   Vicinay placed the tether chain into the stream of commerce. Vicinay's manufacturing of the tether chain made it defective, unsafe for its intended purposes and unreasonably dangerous in construction and/or composition when put to the tether chain's reasonably anticipated use.

36.   The tether chain was expected to and did reach Petrobras, the consumer and/or end-user, without delay and without substantial change in the condition in which the tether chain was manufactured. The tether chain was unreasonably defective and dangerous at the time it was sold to and being used by Petrobras.

37.   The chain deviated in a material way from otherwise similar and/or identical chains designed, manufactured, and/or marketed by Vicinay. A safe alternative design existed by way of a chain that did not contain weld over repairs.

38.     The tether chain contained a redhibitory vice or defect which rendered it unfit for its intended purpose. As the manufacturer of the tether chain, Vicinay is presumed to have known of the vice or defect.

39.     The tether chain was defective and caused Petrobras and its subrogated Underwriters to incur substantial damage.

40.     Accordingly, Underwriters are entitled to all damages recoverable under the Louisiana Products Liability Act.

**Second Cause of Action – Louisiana Redhibition**

41.     Vicinay breached the warranty against redhibitory defects in the tether chain. The defects in the tether chain, which existed at the time of delivery, rendered the tether chain useless, or rendered its use so inconvenient that it must be presumed the buyer would not have purchased the chain had it known of the defects.

42.     Vicinay had reason to know the particular use Petrobras intended for the chain, Petrobras' particular purpose for buying the chain, and that Petrobras was relying on Vicinay's skill or judgment in selecting and/or manufacturing the tether chain. However, the chain was not fit for Petrobras' intended use or particular purpose.

329403

43.     Vicinay knew that the tether chain, which it manufactured, had a defect, but omitted to declare it, and Vicinay declared that the tether chain had a quality that Vicinay knew it did not have.

44.     Vicinay's breach of the warranties against redhibitory defects caused damage to Petrobras and Underwriters, and Underwriters are entitled to all damages recoverable under redhibition, including damage to and loss of use of the product, the purchase price plus interest, consequential damages and attorney's fees.

### Third Cause of Action – Negligence

45.     Underwriters incorporate by reference paragraphs 1 through 45.

46.     Underwriters plead this claim in the alternative to the extent that negligence claims for damages stemming from a defective product are not subsumed by the Louisiana Products Liability Act, and also alternatively under maritime law.

47.     In the ordinary course of its business, Vicinay manufactured, sold, and delivered the defective tether chain. Vicinay had a duty to exercise reasonable care, competence, and skill in among other things (a) manufacturing, inspecting, and selling the chain, (b) detecting and remedying any inadequacies,

329403

deficiencies, and defects in the chain, and (c) warning Technip and/or inspectors and/or Petrobras of any potential deficiencies, flaws and/or defects in the chain.

48.    A reasonably prudent inspection of the chain by Vicinay would have revealed, and did reveal, one or more cracks or other defects in the chain that were welded over in Vicinay's manufacturing process such that the chain was unusable, unsuitable and unfit for use by Petrobras.

49.    Vicinay breached its duties by failing to exercise reasonable care, competence, and skill in manufacturing, selling, and delivering the chain, by (a) manufacturing a defective chain, (b) failing to remedy the inadequacies, deficiencies, and/or defects in the chain by not scrapping the entire chain and manufacturing a new one, (c) concealing the inadequacies, deficiencies, and/or defects in the chain, and (d) failing to warn of the potential dangers in using the chain considering that cracks and other defects in the chain were welded over during Vicinay's manufacturing process.

50.    The damages that resulted from the chain failure were foreseeable and of the type and magnitude that would be expected from such a failure.

51.    Vicinay's breach of its duties proximately caused Petrobras and Underwriters to suffer damages, and Underwriters are entitled to recover all damages allowed by Louisiana law.

**Fourth Cause of Action – Gross Negligence**

52.     Underwriters incorporate by reference paragraphs 1 through 52.

53.     Underwriters plead this claim in the alternative to the extent gross negligence claims for damages stemming from a defective product are not subsumed by the Louisiana Products Liability Act, and also alternatively under maritime law.

54.     Vicinay sold and delivered the defective tether chain knowing that it had cracks and other defects that were welded over during Vicinay's manufacturing process, and knowing that Petrobras specifically needed a chain that was free from any cracks or other defects whatsoever and had no welding over of any cracks or defects, and knowing that Petrobras was to employ the defective chains in a multi-million dollar, deepwater offshore oil-and-gas production system.

55.     Given the magnitude of the safety, environmental and financial risks posed by a failure of the chain in this deepwater oil-and-gas production system, the foreseeability of the type of harm and magnitude of damages that could result from the failure of the chain, and the relative ease of preventing the accident (by selling and delivering a chain that was free from any cracks or other defects whatsoever, regardless of the fact that any such cracks or other defects

329403

were welded over during the manufacturing process), Vicinay willfully (a) failed to exercise due care and/or diligence, (b) acted in the absence of care and in utter disregard of the dictates of prudence and the exercise of ordinary care, and (c) acted in wanton and reckless disregard for public safety and the rights of others, including, specifically, Petrobras.

56.    Vicinay's acts and omissions in selling and delivering the defective and defectively manufactured and/or repaired chain objectively involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including, specifically, Petrobras.

57.    Vicinay had actual, subjective awareness of the risk involved, but nevertheless acted with conscious indifference to the rights, safety, or welfare of others including, specifically, Petrobras.

58.    Vicinay's gross negligence proximately caused Petrobras and the Underwriters to sustain the damages and Underwriters are entitled to recover punitive damages.

**Fifth Cause of Action – Failure to Warn**

59.    Underwriters plead this claim in the alternative to the extent failure to warn claims for damages stemming from a defective product are not subsumed by the Louisiana Products Liability Act, and also alternatively under maritime law.

329403

60.   After manufacturing and/or marketing the chain, Vicinay knew or reasonably should have known of the cracks and other defects that were welded over and that such welding over was unreasonably dangerous, yet utterly failed to warn or disclose to Petrobras that such cracks and other defects were welded over and the resulting unreasonably dangerous condition of the chain. Instead, Vicinay did the very opposite – it sought to conceal the cracks and other defects in the chains by welding over them in direct contravention of the express representations it made to Petrobras at the October 8, 2008 meeting and other standards.

61.   In addition and/or in the alternative, the chain was defective and unreasonably dangerous because there was no warning that it could not sustain the loads placed on it by the buoyancy can and the attached riser. Vicinay's failure to give adequate warnings of the danger of the chain, which dangers were known and/or should have been known by Vicinay through the application of reasonably developed human skill and foresight, and/or Vicinay's failure to provide adequate warnings to avoid such dangers, rendered the chain unreasonably dangerous.

62.   Vicinay's failure to disclose or warn that cracks and other defects existed or were welded over, the concealment of the same and Vicinay's failure to warn of the unreasonably dangerous condition and manufacture of the chain and

that it could not sustain the loads placed on it by the buoyancy can and riser system, in whole or in part, caused damages to Petrobras and Underwriters, and Underwriters are entitled to recover all damages allowed by law.

### Sixth Cause of Action – Fraud/Fraudulent Inducement

63.     Underwriters plead this claim in the alternative to the extent fraud claims for damages stemming from a defective product are not subsumed by the Louisiana Products Liability Act, and also alternatively under maritime law.

64.     Vicinay agreed to manufacture and fabricate the chain pursuant to certain Det Norske Veritas ("DNV," the certifying authority for the chains) standards. These standards prohibit repair welding of defects in certain circumstances, including repair-welding of defects on the defective tether chain. Vicinay's own standards prohibit welding over on the defective chain.

65.     Additionally, Javier Vicinay on behalf of Vicinay represented to Petrobras at a meeting in Bilbao, Spain that (1) Vicinay would not weld-over any crack or other defect discovered in any link of the chains, and (2) if material defects were discovered or identified in any link of the tether chains, the entire chain would be scrapped and a new chain would be manufactured.

66.     At all relevant times Vicinay undertook to comply with the DNV standards and Vicinay's own standards when it represented to Petrobras that it

329403

would not weld-over any defects in the chains. At the time the defective chain was manufactured and welded over, Vicinay had over-extended its capacity for manufacturing and production by intentionally taking on multiple projects at one time. Furthermore, Vicinay exercised insufficient control over the flash-welding temperatures at the time the defective links were being manufactured and welded over.

67.    The manufacturing process experienced several breakdowns in Vicinay's quality control procedures which occurred during manufacture of the chains, including having the same person in charge of both fabrication and quality control.

68.    Known only to itself, Vicinay did not have and could not obtain enough material to manufacture new links if and when it discovered any defects, despite its promise to scrap all defective links and replace them with a new chain. Therefore, when Vicinay discovered the defects in the tether chains during its quality control process, it was impossible for Vicinay to fulfill its promise and representations to scrap the defective links and manufacture new chains.

69.    Despite Vicinay's explicit representation and agreement to replace the entire chain and not to re-weld defective links, it already had an existing, established and working re-welding process in place, and was already performing

re-welds at its manufacturing facility on other chains at the time it represented to Petrobras that no re-welds would occur on its chain.

70.    After Vicinay re-welded the defective links, it applied the required TSA coating to the links knowing full well that the coating would cover its prohibited re-welding, thus preventing any visual inspection and continuing to cover up its fraud.

71.    In March, 2009 (a full two years before the defective, disguised, re-welded link on the tether chain that failed in this instance), a similar tether chain manufactured by Vicinay for the Exxon Balder project likewise failed because Vicinay re-welded a defective link. Although Vicinay unquestionably knew that the re-welding of a defective link caused the Exxon Balder tether chain to fail, and that it had provided a similar re-welded link to Petrobras, it intentionally perpetuated its fraud by continuing the concealment and failing to disclose both its prohibited re-welding and the failure caused by it.

72.    Vicinay had no present intent to follow the DNV standards or its own standards when it undertook to abide by them, and had no present intent to fabricate the chain in compliance with the representations made to Petrobras in Bilbao, Spain when it made such representations. The undertaking to comply with the DNV standards, its own standards and the representation made in Bilbao,

20

Spain were false representations or false promises of future performance with no

intent to abide by them when made, and knew they were false when made.

73.   Such false representations were subjectively material to Petrobras,

as well as objectively material under any reasonable standard.

74.   Vicinay made these representations with the intent that Petrobras

rely on them. If Petrobras had been aware of Vicinay's actual manufacturing

plans, as well as its inability and/or incapacity to manufacture the chains in

compliance with the DNV standards, its own standards, and in compliance with

the Bilbao representations, Vicinay knew that it could and would lose the

chain-manufacturing project and subject itself to litigation costs as well as

potential liability, and would have to forego the profits from the job.

Consequently, Vicinay falsely and intentionally misrepresented its intent as to the

manufacturing process to ensure that it would not lose the project.

75.   Petrobras justifiably relied on Vicinay's false representations as

Petrobras had no means to determine Vicinay's actual undisclosed intent

regarding the manufacturing of the chains. Had Petrobras known the reality of

Vicinay's intent not to follow through with the DNV standards, its own standards,

and the Bilbao representation, or had Petrobras known of Vicinay's inability and

incapacity to manufacture the chains in compliance with the DNV standards, its

own standards or the Bilbao representations, Petrobras (via Technip or otherwise) would have rescinded any contracts with Vicinay regarding the chains and/or would have obtained other chains from another source rather than run the risk of using welded-over chains on the FPSO project.

76.    As a result of Petrobras' justifiable reliance on Vicinay's false representations, Petrobras had defective chains installed as part of the riser systems. As a result of Vicinay's conscious and knowing decision to provide tether chains with manufacturing defects, and decision to knowingly misrepresent the quality and effectiveness of those chains to Petrobras, FSHR No. 1's chain broke on March 23, 2011 and the loss ensued.

77.    Vicinay's fraudulent actions proximately caused Petrobras and Underwriters to suffer damages, and Underwriters are entitled to recover all damages allowed by law.

**Seventh Cause of Action – Express Warranty**

78.    Underwriters plead this claim in the alternative to the extent express warranty claims for damages stemming from a defective product are not subsumed by the Louisiana Products Liability Act, and also alternatively under maritime law.

329403

79.    As more fully described previously, and below, the chain sold by Vicinay to Technip of which Petrobras was the end user, did not conform to express warranties made by Vicinay. Those warranties induced Petrobras to use the chain in its FPSO project and/or induced Petrobras to use Vicinay's chain to hold the buoyancy can in the FSHR. The damages to Petrobras and Underwriters were proximately caused by Vicinay's breach of those warranties.

80.    Vicinay created the express warranty by affirmation of facts, promise, or description of goods. By way of example, Vicinay directly warranted to Petrobras that the chain would be fit for use in the intended application of offshore mooring and that the chain would not contain re-welds. In fact, Vicinay's own standards prohibit such welding over.

81.    The express warranty complained of was made by Javier Vicinay, on behalf of defendant Vicinay, to Petrobras at a meeting in Bilbao, Spain stating that (1) Vicinay would not weld-over any crack or other defect discovered in any link of the chains, and (2) if material defects were discovered or identified in any link of the tether chains, the entire chain would be scrapped and a new chain would be manufactured.

82.    These affirmations, promises or descriptions induced, and were intended to induce Petrobras into using the chain in its FSHR. Petrobras did, in

329403

fact, use the Vicinay tether chain in the FSHR. This express warranty became the basis of the relationship between Petrobras and Vicinay.

83.    The tether chain did not comply with the representations made by Vicinay. In breach of the express warranties that were made, the chain did contain repair welds of defective links as previously described. Due to this breach the chain failed and/or malfunctioned when put to its intended use, under ordinary circumstances and in an ordinary manner as a direct result of Vicinay's breach of the warranties described in the paragraphs above.

84.    Petrobras notified Vicinay of the breach of the express warranty.

85.    Vicinay's breach of warranty proximately caused Petrobras and Underwriters to suffer damages, and Underwriters are entitled to recover all damages allowed by law, including attorneys' fees.

## VI.    Attorney's Fees

86.    Underwriters have incurred necessary and reasonable attorney's fees in the prosecution of this action and are entitled to recover those fees under Louisiana law pursuant to its claims for Redhibition (La. C.C. art. 2545).

87.    In the alternative, if Louisiana law is found not to apply, Underwriters are entitled to their attorney's fees via their claims for breach of express warranty.

24

VII.   Jury Demand

88.   Plaintiffs are entitled to and hereby demand trial by jury on all issues raised in this Complaint.

VIII.   Damages

89.   Plaintiff incorporate by reference paragraphs 1 through 88.

90.   Underwriters have indemnified Petrobras for a portion of its damages caused by Vicinay's defective chain, and are subrogated to Petrobras' claims for such damages.

91.   As a direct, proximate, and foreseeable result of the acts and omissions of Vicinay described above, Petrobras and Underwriters have collectively incurred and/or will incur over $400 million in damages, and Underwriters are subrogated and entitled to recover for some, or all, of the following categories of damage:

    a.  costs of removal and abandonment of the damaged portions of the FSHR

    b.  emergency response costs;

    c.  stabilization costs;

    d.  tether chain replacement and repair costs;

    e.  subsea equipment interconnection modification costs; and

      f.  riser and related terminal and subsea equipment replacement costs.

92.    Underwriters are further entitled to exemplary and punitive damages.

93.    Underwriters are further entitled to recover their attorney's fees, costs, prejudgment and postjudgment interest, and any and all other damages and costs allowed by law or statute.

WHEREFORE, Plaintiffs, Certain Underwriters at Lloyd's, London and Insurance Companies subscribing to Policy No. B0576 / JM 12318, each for itself and no other, severally, not jointly, based only on its own respective percentage of interest, request a judgment in their favor against Defendant Vicinay Cadenas, S.A., and in favor of Underwriters for all their actual damages, prejudgment and postjudgment interest, costs of court, attorneys' fees, and any such other and further relief, at law or in equity, to which they may be entitled.

Respectfully submitted,

 /s/ George H. Lugrin, IV
George H. Lugrin, IV
Attorney-in-Charge
(TX 00787930) (Fed. 16931)
glugrin@hallmaineslugrin.com
Williams Tower, 64th Floor
2800 Post Oak Boulevard

329403

Houston, Texas  77056-6125
Telephone:  713-871-9000
Facsimile:  713-871-8962

OF COUNSEL:
HALL MAINES LUGRIN, P.C.
Karen K. Milhollin
(TX No. 00790180) (Fed. No. 18038)
kmilhollin@hallmaineslugrin.com

**ATTORNEYS FOR PLAINTIFFS CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND INSURANCE COMPANIES SUBSCRIBING TO POLICY NO. B0576 / JM 12318, EACH FOR ITSELF AND NO OTHER, SEVERALLY, NOT JOINTLY, BASED ONLY ON ITS OWN RESPECTIVE PERCENTAGE OF INTEREST**

329403

CERTIFICATE OF SERVICE

On October 3, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

C. Mark Baker                          mbaker@nortonrosefulbright.com
Kevin O'Gorman                    kogorman@nortonrosefulbright.com
Andrea Fair                              afair@nortonrosefulbright.com
**FULBRIGHT & JAWORSKI L.L.P.**
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone:  713-651-5151
Facsimile:  713-651-5246


Ileana M. Blanco                        ileana.blanco@dlapiper.com
**DLA PIPER LLP**
1000 Louisiana St. Suite 2800
Houston, TX 77002
Telephone: 713-425-8435
Facsimile: 713-300-6035


                                    */s/ George H. Lugrin, IV*
                                    George H. Lugrin, IV

329403